THOMAS A. EDISON, Inc., v. BLACKMAN DISTRIBUTING CO., Inc.

No. 270.

Circuit Court of Appeals, Second Circuit.

Aug. 29, 1933.

Palmer & Serles, of New York City (William Huck, Jr., and Joseph A. Clossick, both of New York City, of counsel), for appellant.

Clark, Reynolds & Hinds, of New York City (Roger Hinds and Leonard J. Reynolds, both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff, a New Jersey corporation, brought this action against the defendant, a New York corporation, to recover "the agreed and reasonable value" of goods sold and delivered to the defendant, asking judgment for $20,634.98 and interest thereon from February 1, 1931. The defendant filed an amended answer to the complaint setting forth a separate and distinct defense to the alleged cause of action and four counterclaims. The plaintiff moved to dismiss all four counterclaims on the ground that none of them stated facts sufficient to constitute a cause of action, to dismiss the second counterclaim on the additional ground that it could not properly be interposed in the action, and to strike out the separate defense on the ground that it was insufficient in law upon its face. The District Court, by an order dated July 2, 1931, granted the motion and ordered that all four counterclaims be dismissed and the separate defense stricken out. In an opinion dated July 2, 1931, however, the District Court held that certain of the allegations in the first counterclaim might "form the basis of affirmative relief against the plaintiff," and accordingly the order of dismissal gave the defendant leave to serve an amended answer in conformity with the directions in the opinion. The defendant filed exceptions to the order, and seasonably interposed a second

amended answer, setting forth a single counterclaim, to which the defendant replied. The matter was referred by the court to a referee, who determined that the plaintiff was entitled to recover from the defendant the principal sum of $19,119.47, and that the defendant might set off the principal sum of $2,533.80 on the basis of its counterclaim. Interest was allowed on various fractions of the principal sums from various dates. The District Court confirmed the referee's report, and judgment was entered for the plaintiff for $19,053.58. The defendant has appealed from the judgment in so far as it dismisses the second, third, and fourth counterclaims set forth in the first amended answer. The plaintiff has taken a cross-appeal from so much of the judgment as allows the defendant a set-off on the basis of the counterclaim set forth in the second amended answer.

This litigation arises out of an agreement in the form of a letter sent by the defendant to the plaintiff on February 1, 1929, "to confirm and set forth the terms of the agreement arrived at on January 22, 1929, between yourselves and our company," and accepted by the plaintiff as expressing the agreement on February 25, 1929. By the terms of this agreement, the plaintiff, a manufacturer of radios and phonographs, appointed the defendant distributor of the plaintiff's products in a designated territory, and agreed to appoint no other distributor, or to act as its own distributor, within that territory "while this agreement remains in effect." The defendant might elect to discontinue handling and distributing the plaintiff's products "at any time during the life of this agreement," in which case the plaintiff might appoint other distributors within the territory. The agreement further provided that: "We are to be free, if we so desire, to handle other radio, combination radio and phonograph, and phonograph products, including records, in said territory until June 1, 1930, and we are to advise you on February 1, 1930, whether or not we desire to °continue as distributors of your said products after June 1, 1930. If we advise you on February 1, 1930, that we desire to continue to act as distributors of your said products, we shall continue to act as such distributors in said territory until February 1, 1933, with the understanding that during the period from June 1, 1930, to February 1, 1933, we will agree if you so desire, to handle only Edison radio, combination radio and phonograph, and phonograph products including records, and with the further understanding that if we so elect to extend the term of our distribu-

torship to February 1, 1933, this agreement may be cancelled by either party on six (6) months written notice given at any time after December 1, 1930."

The defendant duly exercised its option to extend the life of the agreement to February 1, 1933, and agreed, waiving a request from the plaintiff, to handle only Edison products. It is conceded that the defendant became bound to handle only radios and phonographs manufactured by the plaintiff. The parties acted under the agreement for several months during 1930. Other pertinent provisions of the agreement are as follows:

"If you" (the plaintiff) "should elect * * * to cancel this agreement and give us said six months' notice, you will, at our option, take over and assume the lease covering the premises occupied by us at 28 West 23rd Street, New York City, which runs to February 1, 1933, and will purchase the furniture and fixtures, reasonably comparable with the present furniture and fixtures, which we have installed in said premises at a price which shall be mutually agreeable, or in the event that the price cannot be mutually agreed upon, a third party, agreeable to both of us, shall be selected as an arbitrator and the price determined by him shall be final and accepted by both of us and you will make payment for the said furniture and fixtures at the time this agreement terminates. It is further understood that in the event you elect to cancel this agreement and give us the said required notice, you will, upon the termination of the agreement, take back from us all the merchandise of your manufacture and purchased by us from you, which we then have on hand and which is new or saleable in the regular course of business as new, and will pay us for such merchandise the net cost to us of same. * * *

"All prices are to be F. O. B. your factory and the list prices are to be no greater than those made to other distributors; also discounts from list prices and for cash payments to be no less than that given to other distributors. It is also understood that if the prices of your said products are lowered at any time during the period of this agreement, we shall be refunded the difference between the cost to us under new prices and the cost to us under the old prices of any of such products which have been billed to us within the preceding ninety (90) days, which are on hand unsold, whether they are on hand in our establishment or whether they have been delivered to our dealers and remain on hand unsold by them. * * *

"It is further understood that it is your intention to manufacture and that you will endeavor to have ready to market on or about June 1, 1929, a reasonably complete line of radio sets, phonographs or combination phonograph and radio sets to be sold at list prices commencing at or about One hundred and twenty-five dollars ($125.00) and ranging upwards in accordance with the type of such products, and it is your intention that these list prices shall be reasonably competitive with similar merchandise offered to the public by other manufacturers."

On June 20, 1930, the defendant by letter indicated some dissatisfaction with the high-price range of the plaintiff's products, and asked whether the latter would insist that the defendant comply with the requirement that no other "make" of radio or phonograph should be handled by the defendant. The plaintiff by a letter dated June 25, 1930, replied that, unless the agreement under which the parties were acting should be substantially modified for the benefit of the plaintiff, the requirement that no other "make" might be handled would be insisted on. On July 11, 1930, the defendant by letter referred to the clause of the agreement stating the plaintiff's "intention" to bring out "a reasonably complete line of radio sets, phonographs or combination phonograph and radio sets to be sold at list prices commencing at or about One hundred and twenty-five dollars ($125.00) and ranging upwards," and called upon the plaintiff to furnish lower priced sets than had as yet been supplied. No answer to this communication appears in the record, but the referee found that the plaintiff had already on July 9, 1930, informed the defendant that it would not manufacture a cheaper line of merchandise. The referee further found that the plaintiff did not consent to the defendant's handling other makes, and that on August 6, 1930, the defendant notified the plaintiff that it had taken on and was handling the Clarion radio, which was not manufactured by the plaintiff. However, no protest was made by the plaintiff until nearly three months later, when, on November 5, 1930, it informed the defendant by letter that the latter's distribution of the Clarion radio "breaches in a vital respect your agreement with us" and that "we therefore notify you that our agreement is at an end." To this letter the defendant replied on November 7, 1930, that: "We do not consider that your letter is proper notice to us of your cancellation of this agreement, and this is to advise you that we do not accept it as such."

The goods for the agreed value of which this action is brought were all sold by the plaintiff to the defendant after the notice of cancellation of the agreement by the plaintiff and rejection of such notice by the defendant referred to above. These goods were sold pursuant to an offer by the plaintiff contained in a letter sent November 12, 1930, which made no reference to prior dealings or disputes between the parties, and was couched in the most cordial, not to say familiar, terms, and extended best wishes for "a bang-up holiday business." This offer was accepted by the defendant in a letter dated November 22, 1930, and, accordingly the merchandise for the price of which this action is brought was delivered to the defendant by the plaintiff. The defendant admits that it is indebted to the plaintiff for this merchandise in an amount exceeding $17,000.

We shall deal first with the appeal taken by the defendant from the order and judgment of the District Court in so far as they dismiss the second, third, and fourth counterclaims set forth in the first amended answer.

### Second Counterclaim.

The second counterclaim attempts to set forth a cause of action in tort for deceit. It alleged:

(1) That in order to induce the defendant to enter into the agreement, the plaintiff "falsely and fraudulently represented to the defendant and covenanted with the defendant * * * that it would manufacture and sell to the defendant a reasonably complete line of radio sets and other products to be sold at list prices commencing at or about $125.00 and ranging upwards in accordance with the type of such products, but being a cheaper line than the existing line of plaintiff's products * * *."

(2) That the plaintiff after making the agreement "in order to deceive and defraud the defendant * * * falsely and fraudulently represented * * * that it was going to continue in the manufacture and sale of the radio sets; that it would not 'dump' its products and that it was in the business 'for a long pull.'"

The second counterclaim also alleged that the "representations were false and were known to the plaintiff to be false when made and were made by the plaintiff with intent to deceive and defraud defendant by inducing the defendant * * * to continue to purchase and stock plaintiff's products which plaintiff had already manufactured and had

on hand"; and alleged that defendant, "relying on the truth of such representations was induced to and did spend large sums of moneys for plaintiff's goods, for advertising, advances to a large sales force, for credits and for promotion work, and refrained from carrying on other business which it could have engaged in for profit." Finally, it alleged that the plaintiff fraudulently commenced to "dump" its radio sets "at prices which were so much less than the prices at which it was selling * * * to defendant * * * that the defendant could not sell the products which it had purchased from plaintiff in competition with the goods which had been so 'dumped,'" and, in a letter dated December 15, 1930, announced to the defendant that it would retire from the radio business and did so retire. By reason of the foregoing, plaintiff claimed $150,000 damages.

■ This counterclaim incorporates by reference a letter from the plaintiff to the defendant which begins by saying: "This is to confirm and set forth the terms of the agreement * * * between yourselves and our company." It is, therefore, a final memorial of the agreement of the parties and all the allegations about a contemporaneous oral agreement must under the parol evidence rule be disregarded. When the letter says, "It is understood that it is your intention to manufacture * * * a reasonably complete line of radio sets * * * to be sold at list prices commencing at about * * * $125.00," it sets forth no promissory obligation or contractual relation, but an intention and nothing more, and affords no basis for recovery in contract. But the counterclaim sets forth a representation of an intention to manufacture cheap radio sets made to induce the defendant to enter into the agreement, that it was false and known to be false, was made to deceive the defendant and relied on by the latter to his damage. If it had been alleged that the plaintiff after making such a representation as to its intention had failed to manufacture the cheap radio sets, the cause of action would be complete. Adams v. Gillig, 199 N. Y. 314, 92 N. E. 670, 32 L. R. A. (N. S.) 127, 20 Ann. Cas. 910; Ritzwoller v. Lurie, 225 N. Y. 464, 122 N. E. 634; Deyo v. Hudson, 225 N. Y. 602, 122 N. E. 635; Adams v. Clark, 239 N. Y. 403, 146 N. E. 642. The cause of action relied on is not that the plaintiff did not intend to do what it contracted to do when it induced the defendant to contract as in Continuous Zinc Furnace Co. v. American Smelting & Refining Co. (C. C. A.) 61 F.(2d) 958, for it had never

bound itself contractually to manufacture the cheap radios. The tort here consists in a fraudulent representation of an intention to do something, though not contracted for, in order to induce the making of the agreement. There is, however, no allegation in the counterclaim (and the question arises wholly upon the pleading itself) that the plaintiff failed to manufacture cheap radio sets, so the cause of action based on this item of the second counterclaim fails. There is no showing that the District Judge was requested to allow a repleader and no error is assigned because of his failure to grant one.

■ The allegation that the plaintiff falsely represented that it would continue manufacturing and would not "dump" its products is also unavailing. The representations are said to have been made after the contract was entered into, and not as an inducement to the making of it. As we shall later show, the defendant was bound under the agreement to purchase the amount of its business requirements. Therefore, the only damage which could arise from these false representations would be that the defendant was thereby induced to purchase more goods than it was bound under the contract to take, and no such damage is alleged. The second counterclaim was properly dismissed.

### Third Counterclaim.

■■ The third counterclaim is based upon the allegation that the plaintiff, on December 15, 1930, announced to the defendant that it would retire from the radio business and would no longer manufacture radio sets; that it ceased operations on that date and thereby canceled the agreement and became liable to purchase the furniture and fixtures and assume the lease and pay for the merchandise of plaintiff's manufacture at 28 West Twenty-Third street as the agreement provided must be done if the plaintiff should give six months' written notice of cancellation after December 1, 1930. The counterclaim also sets forth that the plaintiff never gave the six months' notice called for by the agreement but, by announcing on December 15, 1930, that it would no longer manufacture radio sets and failing to manufacture the same, canceled the contract on that date. It also alleges that the plaintiff failed to assume the lease and purchase the fixtures and pay for the products of plaintiff's manufacture on hand, all to defendant's damage in the sum of $102,340.

It is a fatal objection to this counterclaim that the announcement of cancellation of the agreement was given less than six

months before the date when the counterclaim was interposed so that the cause of action had not arisen when the counterclaim was asserted. Moreover, the cancellation provided for in the agreement was not a breach of contract by the plaintiff, and the breach of contract which occurred when the plaintiff ceased to manufacture and supply the business needs of the defendant was not the cancellation provided for in the agreement. Any damages arising out of a cancellation on notice would be entirely different from those arising out of a breach. The plaintiff had a right to choose which it would subject itself to and cannot be required to assume the lease and repay the plaintiff upon the theory that its announcement of retirement from business was the equivalent of notice of cancellation provided for in the contract. We think it clear that the third counterclaim cannot be sustained and was properly dismissed.

### Fourth Counterclaim.

We have already said that the oral agreement between the parties merged in the letter, which is incorporated by reference in the fourth counterclaim. The question, therefore, arises, what is the proper interpretation and effect of the letter of the defendant on February 1, 1929, which the plaintiff accepted and which constituted the agreement between the parties. The plaintiff contends that the letter simply set forth a course of proposed business dealings and that the only thing the parties agreed to do was to refrain from dealing with others for a definite period; that it did not contain any promise of the defendant to buy, or of the plaintiff to sell, any quantity of merchandise.

While the foregoing contention is not without some force, we think the letter by the defendant of February 1, 1929, accepted by the plaintiff gave rise to an implied agreement that the plaintiff should sell the radio and other products described in the letter to the extent that might be reasonably required to enable the defendant to carry on its business as distributor for the plaintiff, and that the defendant should purchase the same. If such was the contract, the plaintiff was not relieved from performing its obligations by going out of business. Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218.

Schnerb v. Caterpillar Tractor Co. (C. C. A.) 43 F.(2d) 920, was a decision by this court. Schnerb, who was the distributor, sought damages for breach by the defendant, who was the manufacturer, of its covenant not to invade the territory that it had assigned to Schnerb. Schnerb asserted that the defendant had broken this covenant by selling tractors to the French government direct. The contract in that case consisted of a letter by the defendant to Schnerb which gave the latter "exclusive representation" in the sale of defendant's tractors in certain territory, including France. The letter contained no promise to buy or sell. It might be argued, as here, that all that was left to the will of the parties. Nor did the letter set forth any definite number of tractors which it was proposed that Schnerb was to buy. It did provide, however, that a price "for the present" of a 60 horse power type of tractor should be $3,125 and that at all times the prices should be in keeping with those being charged other agents using a like amount of goods. In that case we said in effect that there was an implied agreement by each party not to sell tractors in the other's territory, that the defendant promised that the prices charged Schnerb should be in keeping with those charged other agents, and the defendant was under an implied obligation to fill Schnerb's orders if the capacity of its plant permitted.

In Abrams v. George E. Keith Co. (C. C. A.) 30 F.(2d) 90, a manufacturer agreed to sell and deliver shoes to a customer at prices to be agreed on from time to time, and the customer undertook to resell the shoes, as the manufacturer's agent, under the agreement that the customer should have the exclusive sale of the shoes of the manufacturer. It was argued that the contract was invalid for lack of mutuality, but the Court of Appeals of the Third Circuit held it valid and decided that when the manufacturer refused to fill orders furnished by the customer there was a breach of contract.

In Mills-Morris Co. v. Champion Spark Plug Co. (C. C. A.) 7 F.(2d) 38, 39, the plaintiff, who was a dealer in automobile accessories, agreed to keep on hand at all times a stock of the different types of spark plugs manufactured by the defendant and "sufficient to supply the requirements" of plaintiff's regular trade, and also agreed that all of plaintiff's purchases during the contract term should be at certain specified prices. Plaintiff further agreed to canvass the territory for customers and promote the defendant's trade in every reasonable way. The defendant did not agree in express terms to sell spark plugs to the plaintiff, but the Court of Appeals of the Sixth Circuit held that such an obligation was to be "implied" from the "undertakings and the requirements that it exacted of plaintiff" and that a repudiation of the agreement

by the defendant gave rise to a good cause of action on the part of the plaintiff.

In Ehrenworth v. George F. Stuhmer & Co., 229 N. Y. 210, 128 N. E. 108, it was agreed between the plaintiff and the defendant that the former should purchase, and the latter should sell, all the pumpernickel which the plaintiff, who was a dealer in bread, required upon his route, and should pay therefor a price one cent less than the wholesale price and two cents less than the retail price. It was also agreed that the plaintiff was not to sell any other pumpernickel to its customers and that the defendant was to furnish plaintiff with such amount as his business required. The foregoing was held a valid contract not lacking in mutuality, although there was no express promise to purchase any particular amount of pumpernickel.

The decisions in Wood v. Lucy, Lady Duff-Gordon, 222 N. Y. 88, 118 N. E. 214; Moran v. Standard Oil Co., 211 N. Y. 187, 105 N. E. 217; N. Y. C. Iron Works Co. v. U. S. Radiator Co., 174 N. Y. 331, 66 N. E. 967; Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Horton v. Hall & Clark Mfg. Co., 94 App. Div. 404, 88 N. Y. S. 73; Phœnix Hermetic Co. v. Filtrine Mfg. Co., 164 App. Div. 424, 150 N. Y. S. 193; Jacquin v. Boutard, 89 Hun, 437, 35 N. Y. S. 496; Turner v. Goldsmith, L. R. 1 Q. B. (1891) 544, are to the same effect.

Plaintiff contends that the foregoing cases are not in point because the defendant here was not an agent and there was no promise by plaintiff to supply the requirements of the defendant's business. But the supposed difference seems tenuous. The letter on which the agreement between the parties is founded appointed the defendant plaintiff's "distributor." It provided that the appointment was to extend until February 1, 1933, but might be canceled by either party on or after December, 1930, upon six months' written notice and that if the plaintiff gave such notice it should be required to assume the lease of the premises occupied by defendant which ran to February 1, 1933, and to purchase the furniture and fixtures therein and to take back and pay the cost of all merchandise of plaintiff's manufacture which defendant might have on hand. It was also agreed that the plaintiff would not appoint any other distributor in its territory during the life of the contract and that, if desired, the defendant would only handle plaintiff's products. It was provided that the prices to the defendant should be no greater than those made to other distributors, and that if prices were

lowered after goods had been delivered to the defendant, certain rebates were to be allowed to it and its customers for all products unsold by it, or them, and purchased within ninety days. Provision was also made for discounts to defendant's dealers, and defendant was required to send plaintiff reports of net billings, together with copies of invoices. It was agreed that plaintiff should pay one-half the cost of newspaper or magazine advertising incurred either by the defendant or its dealers in connection with the sale of plaintiff's products. It was also agreed that the plaintiff should consult with defendant and give due consideration to its suggestions as to changes in designs and types of instruments and records which defendant might consider desirable and that the latter should offer suggestions based on its long experience which it wished to place at plaintiff's disposal. We can see no distinction between a distributor's contract of this kind and the so-called agency contracts in which it is apparently admitted that agreements to sell and purchase would be implied. Under the agreement of February 1, 1929, as extended, defendant was compelled to do no business in radio products within a specified territory except with plaintiff, and the contract plainly required co-operation. It would defeat its purposes if agreements to purchase and sell were not implied. While the word "requirements" was not used, it must be supplied to render what was plainly a contract founded on mutual promises intelligible and effective. The plaintiff, having appointed the defendant distributor and obtained from the latter a promise to deal exclusively in plaintiff's products, would not fulfill its contract unless it to a reasonable extent filled defendant's orders.

The decision in Schlegel Mfg. Co. v. Peter Cooper's Glue Factory, 231 N. Y. 459, 132 N. E. 148, 150, is relied upon by plaintiff, but is clearly distinguishable. In that case the defendant, a manufacturer of glue, wrote a letter to the plaintiff saying it had entered the "contract for your requirements of 'Special B. V.' glue for the year 1916, price to be 9¢ per lb. terms 2% 20th to 30th of month following purchase. Deliveries to be made to you as per your orders during the year * * *." At the bottom of the letter, the plaintiff wrote: "Accepted." But the plaintiff did not agree "to sell any of the defendant's glue, to make any effort towards bringing about such sale, or not to sell other glues in competition with it." As the court said: "The only obligation assumed by it was to pay nine cents a pound for such glue as it

might order." There was no appointment of an exclusive agent or distributor as in the case before us. The buyer did not agree to handle only the seller's products, but was a mere jobber engaged in no business requiring glue so that there was no ascertainable standard of "requirements." Nassau Supply Co. v. Ice Service Co., 252 N. Y. 277, 169 N. E. 383.

In Smith v. Diem, 223 App. Div. 572, 229 N. Y. S. 56, affirmed 249 N. Y. 590, 164 N. E. 595, the defendant promised to sell no cigars to any other dealer than the plaintiff so long as the latter bought 10,000 per week. The plaintiff did not, as in our case, agree to buy of no other manufacturer. There was no more than a unilateral offer in a letter by the plaintiff, to which the defendant made no reply.

We think the contract set up in the fourth counterclaim is governed by the principles laid down in Schnerb v. Caterpillar Tractor Co. (C. C. A.) 43 F.(2d) 920; Abrams v. George E. Keith Co. (C. C. A.) 30 F.(2d) 90; Ehrenworth v. George F. Stuhmer & Co., 229 N. Y. 210, 128 N. E. 108; Turner v. Goldsmith, 1 Q. B. (1891) 544; and other decisions we have referred to, and that the judgment dismissing this counterclaim must, therefore, be reversed with leave to interpose an answer thereto, if the plaintiff should be so advised.

### Amended First Counterclaim in Second Amended Answer.

As already stated, Judge Coxe dismissed the first counterclaim as well as the three others and allowed the defendant to amend it, whereupon it alleged the making of the agreement of February 1, 1929, and the extension thereof to February 1, 1933, and set forth that it was provided in such agreement that if the prices of the plaintiff's products were lowered at any time there should be refunded to the defendant the difference between the cost under the new prices and the cost thereof under the old prices on all products which had been billed to the defendant within the preceding ninety days and were on hand unsold at the time of such reduction. The amended counterclaim further alleged that on or about October 15, 1930, plaintiff, without notice to the defendant, reduced its prices on its products and the defendant thereupon became entitled to a refund; that on or about that date the defendant had on hand certain products purchased by it from plaintiff and billed within the preceding ninety days on which the plaintiff had reduced its prices; that after the 15th day of October,

and while the agreement was still in force, the defendant purchased from the plaintiff certain additional products of a class upon which the plaintiff had reduced its prices on or about the 15th day of October. That by reason of the aforesaid reduction in prices by the plaintiff, the defendant became entitled to a refund of a specified amount, no part of which had been paid. Plaintiff filed a reply to this amended counterclaim in which it alleged that shortly prior to November 5, 1930, defendant commenced to distribute a radio known as the Clarion radio in the territory specified in the agreement; that this was not an Edison radio and was not manufactured by plaintiff; that defendant's distribution of the Clarion radios was in violation of the agreement that defendant should handle only Edison products and constituted a breach of a vital and dependent covenant of the agreement between the parties; that on or about November 5, plaintiff served upon defendant a notice in writing whereby and because of the defendant's breach in distributing the Clarion radios the agreement was terminated and plaintiff's obligations thereunder ceased and were discharged. In accordance with the foregoing pleadings the defendant demanded refunds in amounts specified and the plaintiff demanded judgment dismissing the counterclaim.

The plaintiff contends that the sales of goods after plaintiff gave notice on November 5 that the distribution of the Clarion radios constituted a vital breach of the agreement which was thereby terminated constituted a new transaction outside of the contract, to which the provisions relating to refunds did not apply. The referee found that as early as August 6, 1930, the plaintiff was notified that the defendant was selling Clarion radios, and yet went on shipping its products to the defendant and doing business with the latter. We agree with his conclusion that such conduct was a waiver by the plaintiff of its right to terminate the contract for this breach and that under such circumstances its only remedy was to sue for any damages that it could prove by reason of the breach. Termination of the contract for this partial breach could only be had after reasonable notice to perform. We also agree with the referee that the later sales cannot be treated as transactions separate from the contract.

We have already said in this opinion that the agreement between the parties set forth in the letter of February 1, 1929, constituted a valid contract of purchase and sale. When the deliveries of radio products in December,

1930, were made, the agreement was still in existence and as a matter of law they were bound to become subject to its terms. The plaintiff appeals from the decision of the issues raised by its reply to the amended first counterclaim on the ground that its notice of rescission on November 5 was effectual to cancel the agreement and that even if the contract was still in force the goods were sold under an independent arrangement that included no right to refunds because of price reduction. We differ with both contentions. Continuance by the plaintiff of sales under the contract, and acceptance of performance by the defendant, amounted to an election to continue the contract and not to terminate it because of the breach. In such a situation no new consideration was required to prevent cancellation and plaintiff's letter of November 5, 1930, was ineffectual to terminate the agreement. Champion Spark Plug Co. v. Automobile Sundries Co. (C. C. A.) 273 F. 74; Rosenthal P. Co. v. Nat. Folding B. & P. Co., 226 N. Y. 313, 123 N. E. 766; Brady v. Cassidy, 145 N. Y. 171, 39 N. E. 814; Tipton v. Feitner, 20 N. Y. 423; Panoutsos v. Raymond Hadley Corporation (1917) 2 K. B. 473; McNicholas v. Prudential Insurance Co., 191 Mass. 304, 77 N. E. 756; Williston on Contracts, §§ 682, 687.

Defendant quite properly replied to the letter of November 5, 1930, that it did not consider plaintiff's letter a proper notice of cancellation of the agreement. As a matter of fact, the contract contained a clause, which we have already discussed, stating that it was plaintiff's intention to put out a cheaper radio line. Defendant had constantly urged it to do this because cheaper sets were needed for the trade than those which the plaintiff was selling. The defendant never dealt in any radio of a price comparable to the plaintiff's that did not originate with the latter. Under these circumstances, we think that the breach was partial. But whatever it was, the conduct of the plaintiff had precluded it from treating the contract as terminated until after giving the defendant a reasonable notice that it must cease selling the Clarion line and resume total performance.

We hold that the refunds were properly computed and the amount due from the defendant was correctly reported by the referee. The amount of the judgment must, however, depend on what damages, if any, the defendant may be able to establish under its fourth counterclaim. The judgment is affirmed in so far as it dismisses the first, second, and third counterclaim, and is reversed in so far as it dismisses the fourth counterclaim, with leave to the plaintiff to reply thereto within a time to be fixed by the District Court. The judgment is likewise reversed in so far as it adjudges that the plaintiff recover $16,585.67, interest and costs, because the amount of the recovery by either party will depend on the result of the trial of the issues under the fourth counterclaim. When they are determined, judgment must be entered in accordance with the findings of fact heretofore made by the referee and the decision of the issues raised by the fourth counterclaim and the reply thereto. Parker Washington Co. v. Cramer (C. C. A.) 201 F. 878.

The case is remanded, with directions to proceed in accordance with the views expressed in this opinion.